CV 13 4464

SLR:BGK:WJG
F#: 2013V00914

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

   Plaintiff,

  - against -

APPROXIMATELY TWO HUNDRED TWENTY-SIX
THOUSAND FOUR HUNDRED FIFTEEN DOLLARS AND
FORTY-FOUR CENTS ($226,415.44) SEIZED FROM CITIBANK,
NA ACCOUNT NUMBER 9119792686 HELD IN THE NAME OF
GSMCITY SUPERCENTER LLC, AND ALL PROCEEDS
TRACEABLE THERETO;

APPROXIMATELY SEVEN HUNDRED AND ONE THOUSAND
THREE HUNDRED EIGHTY-ONE DOLLARS AND
TWENTY-EIGHT CENTS ($701,381.28) SEIZED FROM BANK
OF AMERICA, NA ACCOUNT NUMBER 310719215 HELD IN
THE NAME OF GAME CENTER DISTRIBUTION INC. AND,
ALL PROCEEDS TRACEABLE THERETO;

APPROXIMATELY TWENTY-EIGHT THOUSAND DOLLARS
AND ZERO CENTS ($28,000.00) SEIZED FROM BANK OF
AMERICA, NA ACCOUNT NUMBER 3730229572 HELD IN THE
NAME OF PUMA EXPORT INC., AND ALL PROCEEDS
TRACEABLE THERETO;

APPROXIMATELY ONE HUNDRED THIRTY-ONE
THOUSAND EIGHT HUNDRED THIRTY-TWO DOLLARS AND
ZERO CENTS ($131,832.00) SEIZED FROM BANK OF
AMERICA, NA ACCOUNT NUMBER 898030311285 HELD IN
THE NAME OF VA CELL INC., AND ALL PROCEEDS
TRACEABLE THERETO;

APPROXIMATELY ONE THOUSAND NINE HUNDRED
TWENTY-ONE DOLLARS AND FORTY CENTS ($1,921.40)
SEIZED FROM JP MORGAN CHASE BANK ACCOUNT
NUMBER 9423974636 HELD IN THE NAME OF FLORIDA
TRADING SERVICES INC., AND ALL PROCEEDS
TRACEABLE THERETO;

APPROXIMATELY ONE THOUSAND SIX HUNDRED EIGHTY
DOLLARS AND SIXTY-ONE CENTS ($1,680.61) SEIZED FROM

**VERIFIED
COMPLAINT IN REM**

MATSUMOTO, J.

POLLAK, M.J

JP MORGAN CHASE BANK ACCOUNT NUMBER 962469375   :
HELD IN THE NAME OF GUSTAVO BEDOYA, AND ALL   :
PROCEEDS TRACEABLE THERETO;   :
  :
APPROXIMATELY TWO THOUSAND SIXTY-FOUR   :
DOLLARS AND NINETY-SIX CENTS ($2,064.96) SEIZED   :
FROM JP MORGAN CHASE BANK ACCOUNT NUMBER   :
832546105 HELD IN THE NAME OF TECHNOGAMES INC.,   :
AND ALL PROCEEDS TRACEABLE THERETO;   :
  :
APPROXIMATELY TWENTY THOUSAND DOLLARS AND   :
ZERO CENTS ($20,000.00) SEIZED FROM NORTHERN TRUST   :
BANK ACCOUNT NUMBER 2710001888 HELD IN THE NAME   :
OF WATCH TIME AND JEWELRY INC., AND ALL PROCEEDS   :
TRACEABLE THERETO;   :
  :
APPROXIMATELY EIGHTEEN THOUSAND THREE   :
HUNDRED FORTY DOLLARS AND ZERO CENTS ($18,340.00)   :
SEIZED FROM REGIONS BANK ACCOUNT NUMBER   :
009840752 HELD IN THE NAME OF SPG INTERNATIONAL,   :
AND ALL PROCEEDS TRACEABLE THERETO;   :
  :
APPROXIMATELY THREE HUNDRED FIFTY DOLLARS AND   :
ZERO CENTS ($350.00) SEIZED FROM OCEAN BANK   :
ACCOUNT NUMBER 191525805 HELD IN THE NAME OF   :
KUOLA HOLDINGS CORP., AND ALL PROCEEDS   :
TRACEABLE THERETO;   :
  :
APPROXIMATELY ONE THOUSAND EIGHT HUNDRED   :
EIGHTY-FOUR DOLLARS AND EIGHTY-SIX CENTS   :
($1,884.86) SEIZED FROM CITIBANK, NA ACCOUNT   :
NUMBER 3200745045 HELD IN THE NAME OF   :
CLICKDENTAL CORP., AND ALL PROCEEDS TRACEABLE   :
THERETO; and   :
  :
APPROXIMATELY THIRTY-ONE THOUSAND FOUR   :
HUNDRED DOLLARS AND ZERO CENTS ($31,400.00) SEIZED   :
FROM CITIBANK, NA ACCOUNT NUMBER 9117147628 HELD   :
IN THE NAME OF CT MIAMI LLC, AND ALL PROCEEDS   :
TRACEABLE THERETO.   :
  :
Defendants In Rem.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff, United States of America, by its attorney, LORETTA E. LYNCH, United States Attorney for the Eastern District of New York, WILLIAM J. GULLOTTA, Assistant United States Attorney, of counsel, alleges upon information and belief as follows:

## PRELIMINARY STATEMENT

1.      This is a civil action in rem to forfeit and condemn to the United States the above-captioned Defendants In Rem (the "Defendant Funds") in accordance with the following statutes: 18 U.S.C. § 981(a)(1)(A), as property involved in a money laundering offense in violation of 18 U.S.C. § 1956 or 1957, or property traceable to such property; and/or 21 U.S.C. § 881(a)(6), as moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance, or proceeds traceable to such an exchange, or as money used or intended to be used to facilitate any violation of Title 21 of the United States Code, or property traceable thereto.

## JURISDICTION AND VENUE

2.      This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

3.      Venue lies in the Eastern District of New York pursuant to 28 U.S.C. §§ 1355 and 1395, in that the Defendant Funds were found and seized in the Eastern District of New York.

## DEFENDANTS IN REM

4.      The Defendant Funds consist of approximately: (a) $226,415.44 seized from Citibank, N.A. account number 9119792686 held in the name of GSMCity Supercenter LLC, and all proceeds traceable thereto (the "GSM Account"); (b) $701,381.28 seized from Bank of America account number 310719215 held in the name of Game Center Distribution Inc., and all proceeds traceable thereto (the "Game Center Account"); (c) $28,000.00 seized from Bank of

America account number 3730229572 held in the name of Puma Export Inc., and all proceeds traceable thereto (the "Puma Export Account"); (d) $131,832.00 seized from Bank of America account number 898030311285 held in the name of VA Cell Inc., and all proceeds traceable thereto (the "VA Cell Account"); (e) $1,921.40 seized from JP Morgan Chase Bank account number 9423974636 held in the name of Florida Trading Services, Inc., and all proceeds traceable thereto (the "Florida Trading Account"); (f) $1,680 seized from JP Morgan Chase Bank account number 962469375 held in the name of Gustavo Bedoya, and all proceeds traceable thereto (the "Bedoya Account"); (g) $2,064.96 seized from JP Morgan Chase Bank account number 832546105 held in the name of Technogames, Inc., and all proceeds traceable thereto (the "Technogames Account"); (h) $20,000.00 seized from Northern Trust Bank account number 2710001888 held in the name of Watch Time and Jewelry, Inc., and all proceeds traceable thereto (the "Watch Time Account"); (i) $18,340.00 seized from Regions Bank account number 009840752 held in the name of SPG International, and all proceeds traceable thereto (the "SPG Account"); (j) $350.00 seized from Ocean Bank account number 191525805 held in the name of Kuola Holdings Corp., and all proceeds traceable thereto (the "Kuola Account"); (k) $1,884.86 seized from Citibank, N.A. account number 3200745045 held in the name of Clickdental Corp., and all proceeds traceable thereto (the "Clickdental Account"); and (l) $31,400.00 seized from Citibank, N.A. account number 9117147628 held in the name of CT Miami LLC, and all proceeds traceable thereto (the "CT Miami Account"); (hereinafter collectively, the "Defendant Accounts").

## STATUTORY BACKGROUND

5.      Pursuant to 18 U.S.C. § 981(a)(1)(A) , any property, real or personal, which is involved in a violation of 18 U.S.C. §§ 1956 or 1957, or any conspiracy to commit any such

4

violation, and any property traceable to such property, is subject to forfeiture to the United States.

6.      Pursuant to 21 U.S.C. § 881(a)(6), all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of Title 21 of the United States Code, all proceeds traceable to such an exchange, and all money used or intended to be used to facilitate any such violation of Title 21 of the United States Code, is subject to forfeiture to the United States.

7.      Pursuant to 18 U.S.C. § 984, in any forfeiture action in rem in which the subject property is cash or funds deposited in an account in a financial institution, any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture is subject to forfeiture.

## MONEY LAUNDERING THROUGH THE BLACK MARKET PESO EXCHANGE

8.      Narcotics traffickers amass large amounts of cash proceeds from the sale of narcotics in the United States.   The traffickers, or those associated with traffickers, frequently attempt to give the appearance of legitimacy to these proceeds, i.e., to "launder" them, by making the proceeds appear to have been generated by a legitimate source.   The traffickers must also devise various methods to remit those narcotics proceeds to suppliers of narcotics located in Colombia and other South American countries, which are known source locations of narcotics, without alerting governmental or law enforcement agencies in either country.

9.      In order to accomplish this goal, narcotics traffickers frequently utilize domestic and foreign banks and/or financial institutions in order to make their narcotics proceeds appear to be from legitimate sources and to move those proceeds through the financial system into the countries where narcotics are produced.

10.     In a popular method of laundering narcotics proceeds, narcotics traffickers use third parties to "sell" their narcotics proceeds in the United States in exchange for pesos in Colombia. This practice, commonly known as the Black Market Peso Exchange ("BMPE"), is centered around a BMPE broker who has access to drug dollars and legitimate pesos.

11.     In a common BMPE scheme, a BMPE broker will identify a South American business person who imports goods from places such as the United States, China or Panama. The BMPE broker will offer the South American business person an opportunity to pay a debt owed to an exporter in a foreign country at a significant discount compared to the cost of making the payment through a South American bank. The South American business person who agrees to this scheme will then turn over payment for the imported goods in the form of pesos to the BMPE broker who in turn will contact a Drug Trafficking Organization ("DTO") with operations in the United States. When the BMPE broker contacts the DTO, the broker will offer the pesos in South America in exchange for the narcotics proceeds that are located in the United States.

12.     The BMPE broker will then arrange to have the narcotics proceeds picked up by a member of the BMPE broker's organization. These money pick-ups will usually occur on a street corner or parking lot between two people who have never met before and will most likely never meet again and frequently involve hundreds of thousand dollars in narcotics proceeds.

13.     Following a money pick-up, the BMPE broker arranges to forward the drug proceeds to the exporter in the United States to pay the debt of the South American business person. This can be accomplished by remitting those funds directly to the exporter, either through money orders, wire transfers, cash deliveries, or by depositing the narcotics proceeds directly into an account held by the exporter.

6

## THE BANK SECRECY ACT AND ITS REPORTING REQUIREMENTS

14.     The first step in laundering and/or transporting narcotics proceeds is to deposit the narcotics proceeds with a bank or financial institution.   Once the narcotics proceeds are in a financial institution, they are more easily laundered and transported.

15.     The Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5313 et seq., also known as the Bank Secrecy Act (the "BSA"), was designed to combat money laundering in part by imposing reporting requirements on virtually all transactions involving more than $10,000 in United States currency.

16.     Specifically, under 31 U.S.C. § 5313(a) and its related regulations, when a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of U.S. coins or currency in an amount greater than $10,000, the institution must file a Currency Transaction Report ("CTR") for each cash transaction, such as, by way of example, a deposit, withdrawal, exchange of currency or other payment or transfer by, through or to a financial institution.   CTRs are filed with the Financial Crime Enforcement Network ("FinCEN") at the Detroit Data Center on forms that require the disclosure of, among other things, the identity of the individual who conducted the transaction and the individual or organization for whom the transaction was completed.

17.     "Structuring" is the act of making multiple cash deposits or withdrawals in amounts of less than $10,000 in order to avoid the filing of a CTR.

## THE INVESTIGATION

18.     The New York Drug Enforcement Administration Task Force (the "Task Force") is comprised of federal, state and local law enforcement officers, including officers and agents of the

7

New York City Police Department ("NYPD"), the New York State Police ("NYSP"), the Internal Revenue Service ("IRS"), and the Drug Enforcement Administration ("DEA"). Since 2009, several Confidential Sources (the "Sources") have been acting in an undercover capacity for the Task Force while targeting a major narcotics/money laundering network based in Colombia, South America. The Sources have infiltrated a network of money launderers and money brokers in the United States and Colombia who are affiliated with a DTO based in Cali, Colombia identified as the Norte Valle Cartel (the "Cartel"). The Cartel is responsible for exporting large quantities of illegal narcotics, primarily cocaine, into the United States and Europe for distribution. After the narcotics are distributed in the United States and elsewhere, the Cartel collects and launders the proceeds generated by the sale of the narcotics.

19. In the course of this investigation, the Sources have negotiated indirectly with JAVIER ANTONIO CALLE-SERNA ("SERNA"), a Colombia-based narcotics trafficker and money launderer working for the Cartel, to collect and launder large sums of illegal proceeds in the New York City area and elsewhere. In addition, through this undercover operation, the Sources have arranged for the collection of narcotics proceeds through a number of money brokers working with SERNA, including: JUAN CARLOS HERNANDEZ-ALVAREZ, a/k/a GORFOCA; JAIRO MEJIA; JORGE ENRIQUE MAYA-LLANO, a/k/a KIKE; RICARDO CASANOVA; AMANDO IMACHI-TULCAN, a/k/a PASTUSO; JAVIER MACHADO, a/k/a FREDY; PATRICIA LIGIA ("LIGIA"); and others (the "Brokers").

20. During the undercover operation, it was established that in exchange for a percentage of the proceeds laundered, i.e., a "commission", either the Sources or undercover law enforcement officers would: (a) arrange for the pick-up of illegal narcotics proceeds in the United

8

States and elsewhere; (b) deposit the illegal proceeds into established undercover bank accounts; and (c) conduct a wire transfer of the illegal proceeds to designated business and personal accounts at the direction of SERNA or one of the Brokers acting on his behalf.

21.     As a result of this investigation, the Task Force has uncovered a sophisticated money laundering operation involving a network of individuals who are operating in the United States, Colombia, Guatemala, Panama, China, Costa Rica, Hong Kong, and elsewhere.   As demonstrated below, the investigation revealed that this network utilized numerous businesses and bank accounts in an attempt to launder millions of dollars in narcotics proceeds through the BMPE with the intent to conceal and disguise the true source and ownership of the funds.   During this undercover operation, on approximately sixty (60) occasions between in or about November 2009 and in or about March 2012, money couriers working for the Cartel delivered large amounts of United States currency, checks and/or money orders representing narcotics proceeds to undercover agents or Sources in the United States for the purpose of having these proceeds laundered.   The deliveries of these narcotics proceeds have taken place in Queens, Manhattan, Miami, Chicago, Newark, San Juan, and several locations outside the United States, including Mexico, Canada and the Dominican Republic.   After the collection of the illegal proceeds, the undercover agents and/or the Sources received wire transfer instructions from SERNA or one of the Brokers via email, text message, or telephonically.

22.     During the period of time referenced above, approximately $8,735,403.00 in illegal drug trafficking proceeds was collected and laundered on behalf of the Cartel through approximately one hundred and eighty-two (182) wire transfers to domestic and overseas bank accounts.

9

23.     The investigation has revealed that the Cartel used methods commonly employed by money laundering organizations to transfer narcotics proceeds.   These methods included the following:

(a)   The Brokers contacted the undercover agents or Sources and gave them the telephone numbers of money couriers and the "safe codes" to be used to arrange for the pick-up of the funds;

(b)     The brokers negotiated and paid a commission of between two percent (2%) and twelve percent (12%) of the total amount of funds which were picked up and transferred;

(c)   The physical transfer of large amounts of currency to undercover agents and/or Sources from the money couriers generally occurred in public places such as busy streets, parking lots or shopping malls.   At times, the money couriers delivering the proceeds retrieved them from electronic hidden compartments in their vehicles.   The use of hidden compartments is a counter detection method commonly used by narcotics trafficking organizations to hide contraband and/or proceeds of the illegal conduct;

(d)   The currency was wrapped in plastic heat-sealed bags or heavily perfumed packaging to mask the odor of narcotics, and was also wrapped with rubber bands and/or stored in shoe boxes inside large shopping bags;

(e)   The wire transfer instructions that were provided directly to the undercover agents and/or Sources by the Brokers were consistent with layering methods used by money launderers to conceal the source and final destination of the funds.   Indeed, large amounts of currency were received as part of the pick-up operations and the undercover agents and/or Sources were instructed to separate these large amounts of currency into smaller amounts to be wire

10

transferred to multiple accounts;

(f)   During the transactions involved in this investigation, the undercover agents and/or Sources had multiple communications with the Brokers and their associates regarding the pick-up of the proceeds, the transportation of the proceeds, and the ultimate transfer of the proceeds from the undercover accounts to destinations identified by the Brokers; and

(g) Upon the completion of each of the wire transfers, the undercover agents and/or Sources were required communicate with the Brokers to confirm the wire transfers, which identified the banks from which the transfer of funds originated.

## GAME CENTER DISTRIBUTION INC. AND THE ACTIVITY IN ITS BANK ACCOUNTS

24.   According to records maintained by the California Department of State Division of Corporations, GAME CENTER DISTRIBUTION INC. ("GAME CENTER") was formed on February 19, 2002, and Moein Azizgolshani is the registered agent of the company.   GAME CENTER, which is located 1212 Stanford Ave., Los Angeles, California 90021, is a distributor of video games and is a major exporter of merchandise to Latin America.

25.   The investigation revealed that GAME CENTER received narcotics proceeds from various organizations since at least January 2008.   Since then, GAME CENTER has been identified as the recipient of narcotics proceeds from multiple government undercover operations, and as summarized below, utilized numerous bank accounts to launder these proceeds.

26.   In connection with this and other undercover investigations, during the period from on or about June 22, 2011 to on or about February 21, 2012, multiple wire transfers were made in which a total of approximately $622,881.10 of narcotics proceeds was transferred from undercover bank accounts to an account previously maintained by GAME CENTER at Wells

Fargo Bank, account number xxxx-xxxx-9887 (the "Wells Fargo Account"). Each of these transfers was conducted after narcotics proceeds were picked up by a Source or an undercover agent and deposited into an undercover bank account. After the proceeds were deposited into the undercover accounts, they were subsequently transferred to the Wells Fargo Account by undercover agents pursuant to instructions received by SERNA or a Broker working on his behalf.

27. The investigation further revealed that from in or about January 2008 through in or about December 2012, GAME CENTER utilized additional bank accounts which it previously maintained at HSBC Bank and JP Morgan Chase Bank to facilitate the laundering of narcotics proceeds. More specifically, approximately $509,326.80 of narcotics proceeds collected in pick-up operations was wire transferred into these accounts. Furthermore, cash deposits were structured into the accounts in a manner intended to avoid the filing of Currency Transaction Reports ("CTR"). Some of the cash deposits, which were all in increments of less than $10,000, were made at banking locations in Queens, New York even though GAME CENTER is located in California and does not conduct business in New York. An analysis of the respective bank deposit slips that were used for deposits into the GAME CENTER accounts indicates that the funds deposited into its accounts were laundered narcotics proceeds.

## GSMCITY, GSM CITY SUPERCENTER, AND THE ACTIVITY IN THEIR BANK ACCOUNTS

28. According to records maintained by the Florida Department of State Division of Corporations, GSMCITY INC. ("GSM") was formed on July 1, 2005, and Amjad Azad and Shamin Azad are officers of the company. The Florida Department of State records also indicate that GSMCITY SUPERCENTER LLC was incorporated on August 8, 2011 and its officers are Amjad Azad (President), Shamin Azad (Vice-President) and Manny Calderon (Manager). Each

12

business is located at 3560 NW 72nd Ave., Miami, Florida 33122, is a distributor of cell phones and electronic products and is a major exporter of merchandise to Latin America, North America, and the Caribbean.

29.     The investigation revealed that GSM and its affiliates received narcotics proceeds from various organizations since at least January 2006. During this period of time, GSM was identified as the recipient of narcotics proceeds from multiple government undercover operations, and as summarized below, utilized numerous bank accounts which it used to launder these proceeds.

30.     In connection with this undercover investigation, during the period from on or about February 2, 2010 to on or about April 29, 2011, multiple wire transfers were made in which a total of approximately $302,819.08 of narcotics proceeds was transferred from an undercover bank account to an account previously maintained by GSM at Bank of America NA, account number xxxx-xxxx-9266 (the "BOA Account").   Each of these transfers, which are detailed on the chart below, was conducted after narcotics proceeds were picked up by a Source or an undercover agent and deposited into an undercover bank account.   After the proceeds were deposited into the undercover account, they were subsequently transferred to the BOA Account by undercover agents pursuant to instructions received by SERNA or a Broker working on his behalf:

| DATE OF TRANSACTION | AMOUNT OF TRANSACTION |
|---|---|
| 02/02/2010 | $49,000.00 |
| 03/17/2010 | $21,680.40 |
| 03/23/2010 | $30,000.00 |
| 03/23/2010 | $30,000.00 |
| 03/23/2010 | $16,328.08 |
| 04/29/2010 | $50,000.00 |
| 04/29/2010 | $18,480.60 |
| 06/22/2010 | $60,000.00 |
| 04/29/2011 | $27,330.00 |
|  |  |
| **TOTAL:** | **$302,819.08** |

31.     The investigation further revealed that from in or about January 2006 through in or about December 2012, GSM utilized additional bank accounts which it previously maintained at Bank of America NA, Regions Bank, Wachovia Bank, Suntrust Bank and Bank Atlantic to facilitate the laundering of narcotics proceeds.   More specifically, an analysis of these accounts indicated that in addition to incoming wire transfers from pick-up operations and money order deposits, cash deposits were structured into the accounts in a manner intended to avoid the filing of currency transaction reports ("CTR's").   Some of the cash deposits, which were all in increments of less than $10,000.00, were made at banking locations in Queens, New York even though GSM is located in Florida and does not conduct business in New York. Money orders that were deposited into the GSM accounts were purchased at various locations in the Eastern District of New York.   A further analysis of the respective bank deposit slips and the money orders which

were deposited into the GSM accounts, indicates that the funds deposited into its accounts were laundered narcotics proceeds.  For example, the deposit slips revealed multiple examples of different handwriting and the use of counter deposit tickets.  In addition, money orders were purchased in a structured manner at various locations and reflected the same handwriting denoting GSMCity as the payee.

## THE DEFENDANT ACCOUNTS

### The GSM Account

32.     The GSM Account, which was opened on or about September 8, 2011, is held in the name of GSMCITY SUPERCENTER LLC at Citibank NA.

33.     In the course of the undercover investigation, approximately $75,387.00 of illegal drug trafficking proceeds was picked up by undercover agents on or about November 4, 2011 and deposited into an undercover bank account.  Of these funds, $30,000.00 subsequently was transferred to the GSM Account by undercover agents on or about November 17, 2011 at the direction of LIGIA, a Broker in Colombia working on behalf of SERNA.

34.     On or about November 17, 2011, the undercover operation received approximately $134,126.74 in drug proceeds from an undercover pick-up operation.  This money subsequently was deposited into an undercover bank account.  Of these funds, $58,589.84 and $16,250.00 were wire transferred separately on or about November 29, 2011 into the GSM Account by undercover agents at the direction of LIGIA.

35.     On or about January 13, 2011, at the direction of LIGIA , the undercover operation received $69,205.22 in drug proceeds from an undercover pick-up operation.  This money subsequently was deposited into an undercover bank account.  Subsequently, at LIGIA'S

15

direction, $67,129.06 of these funds was transferred to the GSM Account on or about January 24, 2012 by undercover agents.

36.     The chart below sets forth the transaction dates and amounts of the funds that were transferred into the Subject Account during the course of the investigation:

| DATE OF TRANSACTION | AMOUNT OF TRANSACTION |
|---|---|
| 11/17/2011 | $30,000.00 |
| 11/29/2011 | $58,589.84 |
| 11/29/2011 | $16,250.00 |
| 01/24/2012 | $67,129.06 |
| | |
| **TOTAL:** | **$171,968.90** |

**The Game Center Account**

37.     In the course of the undercover investigation, approximately $399,980.00 of illegal drug trafficking proceeds was picked up by undercover agents on or about April 20, 2012 in Queens, NY and deposited into an undercover bank account.   Of these funds, $11,745.00 was subsequently transferred to the Game Center Account on or about April 30, 2012 by undercover agents at the direction of RICARDO PERNI ("PERNI"), a Guatemalan money broker.

38.     On or about April 24, 2012, the undercover operation received approximately $352,799.00 in drug proceeds from a money pick-up by undercover agents which also was deposited into an undercover bank account.   Of these funds, $33,065.00 was wire transferred on or about May 8, 2012 into the Game Center Account by undercover agents at the direction of TOLIMA LNU, a Colombian money broker.

16

39.     On or about October 19, 2012, the undercover agents received approximately $301,817.00 in drug proceeds from a money pick-up by undercover agents at the direction of CARA LNU ("CARA"), a Colombian money broker.   Of these funds, $28,463.00 and $22,134.00 were wired to the Game Center Account at CARA'S direction by undercover agents on October 25, 2012 and October 26, 2012, respectively.

40.     On or about October 31, 2012, the undercover agents received approximately $173,000.00 in drug proceeds from a money pick-up operation at the direction of CARA. Subsequently, on or about November 9, 2012, at CARA'S direction, $34,354.00 of these funds was transferred by undercover agents to the Game Center Account at the direction of Colombian money brokers.

41.     On or about February 11, 2013 and March 5, 2013, drug proceeds in the amounts of approximately $46,892.00 and $9,285.00, respectively, were wire transferred by undercover agents from an undercover account into the Game Center Account at the direction of Colombian money brokers.

42.     The chart below sets forth the date and amount of the funds which were transferred into the Game Center Account during the course of the investigation:

| DATE OF TRANSACTION | AMOUNT OF TRANSACTION |
|---|---|
| 04/30/12 | $11,745.00 |
| 05/08/12 | $33,065.00 |
| 10/25/12 | $28,463.00 |
| 10/26/12 | $22,134.00 |
| 11/09/12 | $34,354.00 |
| 02/11/13 | $46,892.00 |
| 03/05/13 | $9,285.00 |
| | |
| **TOTAL:** | $185,938.00 |

**The Puma Export Account**

43.     On or about March 31, 2010, the undercover operation received approximately $124,152.00 in drug proceeds from an undercover pick-up operation. This money subsequently was deposited into an undercover bank account. Of these funds, $28,000.00 was wire transferred on or about April 8, 2010 into the Puma Export Account by undercover agents at the direction of FERNANDO OTERO ("OTERO"), a Colombian money broker operating in Florida.

**The VA Cell Account**

44.     On or about April 29, 2010, the undercover operation received approximately $150,000.00 in drug proceeds from an undercover pick-up operation. This money subsequently was deposited into an undercover bank account. Of these funds, $30,000.00 was wire transferred on or about May 5, 2010 into the VA Cell Account by undercover agents at the direction of OTERO.

18

45.     On or about April 12, 2011, the undercover operation received approximately $49,000.00 in drug proceeds from an undercover pick-up operation.   This money subsequently was deposited into an undercover bank account.   Of these funds, $20,200.00 was wire transferred on or about April 20, 2011 into the VA Cell Account by undercover agents at the direction of JUAN ENRIQUE MAYA-LLANO ("MAYA-LLANO"), a Colombian money broker.

46.     On or about May 6, 2011, the undercover operation received approximately $50,000.00 in drug proceeds from an undercover pick-up operation.   This money subsequently was deposited into an undercover bank account.   Of these funds, $48,500.00 was wire transferred on or about May 10, 2011 into the VA Cell Account by undercover agents at the direction of MAYA-LLANO.

47.     On or about August 1, 2011, the undercover operation received approximately $100,000.00 in drug proceeds from an undercover pick-up operation.   This money subsequently was deposited into an undercover bank account.   Of these funds, $33,132.00 was wire transferred on or about August 2, 2011 into the VA Cell Account by undercover agents at the request of a Colombian money broker.

48.     The chart below sets forth the date and amount of the funds which were transferred into the VA Cell Account during the course of the investigation:

| DATE OF TRANSACTION | AMOUNT OF TRANSACTION |
|---|---|
| 05/05/2010 | $30,000.00 |
| 04/20/2011 | $20,200.00 |
| 05/10/2011 | $48,500.00 |
| 08/02/2011 | $33,132.00 |
|  |  |
| **TOTAL:** | **$131,832.00** |

## The Florida Trading Account

49.     On or about October 4, 2011, the undercover operation received approximately $69,300.00 in drug proceeds in Queens, NY from an undercover pick-up operation. This money subsequently was deposited into an undercover bank account. Of these funds, $43,399.50 was wire transferred on or about October 7, 2011 into the Florida Trading Account by undercover agents at the direction of JAIRO PATINO-ROPERO, a Colombian money broker.

## The Bedoya Account

50.     On or about January 4, 2012, the undercover operation received approximately $422,930.00 in drug proceeds from an undercover pick-up operation. This money subsequently was deposited into an undercover bank account. Of these funds, $100,000.00 was wire transferred on or about January 11, 2012 into the Bedoya Account by undercover agents at the direction of JUAN CARLOS CABRERA, a Colombian money broker.

## The Technogames Account

51.     On or about May 26, 2011, the undercover operation received approximately $500,290.00 in drug proceeds from an undercover pick-up operation. This money subsequently

20

was deposited into an undercover bank account. Of these funds, $5,005.00 was wire transferred on or about June 13, 2011 into the Technogames Account by undercover agents at the direction of PANADERO LNU ("PANADERO") a Colombian money broker.

**The Watch Time Account**

52.     On or about November 17, 2011, the undercover operation received approximately $134,126.00 in drug proceeds from an undercover pick-up operation. This money subsequently was deposited into an undercover bank account. Of these funds, $20,000.00 was wire transferred on or about November 28, 2011 into the Watch Time Account by undercover agents at the direction of LIGIA, a Colombian money broker.

**The SPG Account**

53.     On or about November 17, 2011, the undercover operation received approximately $134,126.00 in drug proceeds from an undercover pick-up operation. This money subsequently was deposited into an undercover bank account. Of these funds, $18,340.00 was wire transferred on or about November 29, 2011 into the SPG Account by undercover agents at the direction of LIGIA.

**The Kuola Account**

54.     On or about July 27, 2011 the undercover operation received approximately $184,040.00.00 in drug proceeds from an undercover pick-up operation. This money subsequently was deposited into an undercover bank account. Of these funds, $8,000.00 was wire transferred on or about August 4, 2010 into the Kuola Account by undercover agents at the direction of JUAN CARLOS HERNANDEZ-ALVAREZ, a Colombian money broker.

55.     On or about August 22, 2011, the undercover operation received approximately

21

$314,980.00 in drug proceeds from an undercover pick-up operation. This money subsequently was deposited into an undercover bank account. Of these funds, $4,300.00 was wire transferred into the KUOLA Account by undercover agents on or about August 25, 2011 at the direction of FRANCISCO ROSARIO, a Colombian money broker.

**The Clickdental Account**

56. On or about May 26, 2011, the undercover operation received approximately $500,290.00 in drug proceeds from an undercover pick-up operation. This money subsequently was deposited into an undercover bank account. Of these funds, $53,220.00 was wire transferred on or about May 31, 2011 into the Clickdental Account by undercover agents at the direction of PANADERO.

**The CT Miami Account**

57. On or about October 3, 2011, the undercover operation received approximately $217,885.00 in drug proceeds from an undercover pick-up operation. This money subsequently was deposited into an undercover bank account. Of these funds, $15,000.00 was wire transferred on or about October 11, 2011 into the CT Miami Account by undercover agents at the direction of JAVIER MACHADO, a Colombian money broker.

58. On or about April 20, 2012, the undercover operation received approximately $399,980.00 in drug proceeds in Queens, NY from an undercover pick-up operation. This money subsequently was deposited into an undercover bank account. Of these funds, $9,300.00 was wire transferred on or about April 24, 2012 into the CT Miami Account by undercover agents at the direction of PERNI.

59. On or about October 31, 2012, the undercover operation received approximately

$173,000.00 in drug proceeds from an undercover pick-up operation. This money subsequently was deposited into an undercover bank account. Of these funds, $7,100.00 was wire transferred on or about November 9, 2012 into the CT Miami Account by undercover agents at the direction of CARA.

60.     The chart below sets forth the date and amount of the funds which were transferred into the CT Miami Account during the course of the investigation:

| DATE OF TRANSACTION | AMOUNT OF TRANSACTION |
|---|---|
| 10/11/2011 | $15,000.00 |
| 04/24/2012 | $9,300.00 |
| 11/09/2012 | $7,100.00 |
| | |
| TOTAL: | $31,400.00 |

61.     On November 7, 2011, a grand jury sitting in the Southern District of New York returned an indictment charging the following defendants with conspiracy to commit money laundering in violation of Title 18 U.S.C. § 1956(h): RICARDO CASANOVA; AMANDO IMACHI-TULCAN, a/k/a PASTUSO; and JAVIER MACHADO, a/k/a FREDY.

62.     On September 25, 2012, a grand jury sitting in the Eastern District of New York, returned an indictment charging JAVIER ANTONIO CALLE-SERNA, with, among other offenses: (a) operating a continuing criminal enterprise in violation of Title 21 U.S.C. §§ 848(a), 848(b) and 848(c); (b) murder in violation of Title 21 U.S.C. § 848(e)(I)(A); (c) conspiracy to commit international cocaine distribution in violation Title 21 U.S.C. §§ 959 and 960(a)(3); and (d) conspiracy to commit money laundering in violation of Title 18 U.S.C. § 1956(h).

23

63.     On or about April 15, 2013, agents from the Internal Revenue Service ("IRS")

seized the above-captioned Defendants In Rem pursuant to seizure warrants issued by The

Honorable Joan M. Azrack, United States Magistrate Judge, and the Defendants In Rem currently

are being held by the IRS.

64.     The seizure warrants issued on April 15, 2013, authorized the seizure of the

Defendants In Rem finding probable cause to believe that the funds on deposit were subject to

seizure and forfeiture as property involved in violations of 18 U.S.C. §§ 1956 and 1957, and

subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1) and/or as funds traceable

to the sale of narcotics and subject to forfeiture pursuant to 21 U.S.C. §§ 881 and 853.

## FIRST CLAIM OF RELIEF
### (Property Involved in Money Laundering)

65.     Plaintiff repeats the allegations of paragraphs 1 through 64 as if fully set forth

herein.

66.     The Defendant Funds constitute property involved in money laundering, a violation

of 18 U.S.C. §§ 1956 and 1957.   As a result, the Defendant Funds are subject to forfeiture to the

United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## SECOND CLAIM OF RELIEF
### (Property Traceable to Sale of Controlled Substance)

67.     Plaintiff repeats the allegations of paragraphs 1 through 64 as if fully set forth

herein.

68.     The Defendant Funds constitute moneys, negotiable instruments, securities, or

other things of value furnished or intended to be furnished by any person in exchange for a

controlled substance and all proceeds traceable to such an exchange or money used or intended to

24

be used to facilitate any violation of Title 21 of the United States Code.

69.    As such, the Defendant Funds are subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

WHEREFORE, Plaintiff requests that a warrant of this Court be issued for the arrest of the Defendant Funds; that notice of these proceedings be given to all interested persons; that the Defendant Funds be forfeited and condemned to the use of the United States of America; that the Plaintiff be awarded its costs and disbursements in this action and for such other and further relief as this Court deems just and proper.

Dated: Brooklyn, New York
       August 7 , 2013

                            LORETTA E. LYNCH
                            UNITED STATES ATTORNEY
                            Attorney for Plaintiff
                            Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York 11201

By:             _____

                            William Gullotta
                            Assistant United States Attorney
                            (718) 254-6148

25

## VERIFICATION

1.      I am a Special Agent with the Internal Revenue Service ("IRS") and, as such, have knowledge of the facts underlying this action.

2.      I have read the within verified complaint in rem and know the contents thereof.

3.      The matters contained in the within verified complaint in rem are true and accurate to the best of my knowledge, information and belief.

4.      The source of my information and the grounds for my belief are my personal knowledge, information provided by other law enforcement officers, and the official files and records of the IRS and other law enforcement agencies.

I declare under penalty of perjury that the foregoing is true, to the best of my knowledge, information, and belief.

Dated: Brooklyn, New York
       August 7    , 2013

_____
Joel Murphy
Special Agent
Internal Revenue Service

26